O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CACIQUE, INC., <br>     Plaintiff/Counter-Defendant, <br>   v. <br> REYNALDO'S MEXICAN FOOD COMPANY, LLC, <br>     Defendant/Counterclaimant. | Case No. 2:13-cv-1018-ODW (MLGx) <br> **ORDER GRANTING CACIQUE'S MOTION FOR SUMMARY JUDGMENT ON COUNTERCLAIM [41] AND DENYING REYNALDO'S MOTION FOR SUMMARY JUDGMENT ON COUNTERCLAIM [75]** |

## I. INTRODUCTION

Before the Court are Cross-Motions for Summary Judgment on Defendant Reynaldo's Mexican Food Company, LLC's counterclaim for breach of contract. (ECF Nos. 41, 75.) The contract is a settlement agreement executed in May 2011—the MTK Settlement Agreement. Reynaldo's alleges that Plaintiff Cacique, Inc. is subject to the terms of the MTK Settlement Agreement, and that the agreement bars Cacique's trademark and trade dress claims in this action. Cacique asserts that it is not a party to the MTK Settlement Agreement, and, even if it was a party, the MTK Settlement Agreement does not release Cacique's trademark and trade dress claims. While numerous documents associated with these Cross-Motions have been filed under seal, the Court finds that the reasons for sealing those documents do not apply to the contents of this Order. For the reasons discussed below, the Court **GRANTS**

1  Cacique's Motion for Summary Judgment on Counterclaim (ECF No. 41) and
2  **DENIES** the Reynaldo's Motion for Summary Judgment on Counterclaim. (ECF
3  No. 75.)

## II.  FACTUAL BACKGROUND

Cacique, a well-known brand in the Hispanic cheese market, was formed in 1976 by the de Cardenas family—Gilbert L. de Cardenas, Sr., and Jennie de Cardenas. (ECF No. 42: Gil Decl. ¶ 23.)[1] Their son, Gilbert B. de Cardenas, Jr. ("Gil"[2]), formed MTK, a Delaware corporation, in 2004. (*Id.* ¶ 5.) MTK's only directors are Gil and Jon Kmett. Gil is the only officer. (*Id.* ¶¶ 6–7; ECF No. 42: Kmett Decl. ¶¶ 6–7.) Gil owns 85 percent of MTK with the remaining 15 percent owned by his children in trust. (ECF No. 42: Gil Decl. ¶ 8, Kmett Decl. ¶ 2.)

In 2006, MTK partnered with the Huff Alternative Fund, L.P. and the Huff Alternative Parallel Fund, L.P. (the "Huff Funds") to acquire the assets of Reynaldo's. (ECF No. 79: Bloom Decl. ¶ 5.) At the time, Reynaldo's was a bankrupt Hispanic foods manufacturer. (*Id.*) The Huff Funds are private-equity funds that also own the Wisconsin Cheese Group ("WCG"). (*Id.* ¶ 4.) WCG is the third largest Hispanic foods manufacturer in the United States and a major competitor with Cacique. (*Id.*) MTK and the Huff Funds formed Hispanic Food Holdings, LLC ("HFH") for the acquisition of Reynaldo's. (*Id.* ¶ 5.) Under this partnership, the Huff Funds provided capital to acquire Reynaldo's and MTK contributed its Hispanic lunch meat business and Gil's management skills. (*Id.* ¶ 6.) The partnership between MTK and the Huff Funds was memorialized in several documents including (1) the Contribution Agreement, (2) the Operating Agreement, and (3) the Employment Agreement. (*Id.*

---

[1] A large number of declarations have been submitted in support of and in opposition to the instant Cross-Motions. The Court has reviewed all of the declarations. But for ease of reading, and to avoid redundancy, the Court will not refer to every declaration in which the evidence can be found. There are also several declarants who have submitted multiple declarations. In order to distinguish the declarations, the Court will cite to the docket entry where the cited declaration can be located.

[2] The Court respectfully refers to certain individuals by their first names where necessary to avoid confusion.

¶ 6, Exs. 1–3.) Reynaldo's contends that these documents demonstrate that all involved were aware of Gil's connection to Cacique and took steps to prevent Gil's involvement with Cacique while working with Reynaldo's and the Huff Funds.

From November 2006 until his termination in January 2009, Gil served as President and CEO of Reynaldo's. (*Id.* ¶ 15; ECF No. 42: Gil Decl. ¶ 3.) Gil claims that he was not employed by Cacique during the time that he worked for Reynaldo's. (ECF No. 42: Gil Decl. ¶ 3.) In February 2009, Gil went to work for Cacique as the Chief Operations Officer, and he remains in that position to date. (*Id.* ¶ 4.) Gil claims that at no time has he served as a director of Cacique, and he has never attended any Cacique board meetings. (*Id.*) The only evidence presented in these Cross-Motions of any business relationship between MTK and Cacique was between February 2009 and April 2009.[3] The two entities entered into an oral agreement that a business consultant for MTK, with a work visa sponsored by MTK, would do work for Cacique because Cacique could not hire him directly. (ECF No. 42: Gil Decl. ¶ 9, Kmett Decl. ¶¶ 8–9, Iglesias Decl. ¶ 2.) MTK has apparently conducted no other business, except to wind up affairs, since the end of the oral agreement with Cacique in April 2009. (ECF No. 42: Gil Decl. ¶ 5, Kmett Decl. ¶ 5.)

In April 2009, Reynaldo's filed suit against Gil in Los Angeles County Superior Court alleging that Gil breached the non-compete clause in the Employment Agreement with Reynaldo's when he went to work at Cacique. (*Reynaldo's Mexican Food Co. v. Gilbert B. de Cardenas Jr.*, No. BC411673.) The case settled on June 24, 2010, with Gil signing the settlement agreement individually and on behalf of MTK ("Employment Settlement"). (ECF No. 42: Gil Decl. ¶ 22, Ex. 3.)

In February 2010, while the employment lawsuit was still pending, another lawsuit was filed in Los Angeles County Superior Court, *Fischer et al. v. Hispanic*

---

[3] Reynaldo's has also submitted evidence that Antonio de Cardenas' law office shared an address with MTK. (ECF No. 51: Tobin Decl. ¶ 8, Ex. 5.) Antonio is Gil's brother. However, this evidence does not demonstrate a business connection between MTK and Cacique. It only demonstrates that Antonio's law practice and MTK may share a business relationship.

*Food Holdings et al.*, No. BC431228. Certain trustees and MTK were plaintiffs, while HFH, the Huff Funds, Reynaldo's, and various other entities were defendants. (ECF No. 42: Gil Decl. Ex. 1.) The dispute concerned bonds held by various investment funds. (*Id.*) The case settled, and a settlement agreement was executed on May 17–18, 2011 ("MTK Settlement Agreement"). (*Id.* ¶ 13, Ex. 2; ECF No. 79: Bloom Decl. ¶ 20, Ex. 5.) The MTK Settlement Agreement is the basis of the breach-of-contract counterclaim filed by Reynaldo's in this action.

At the time the MTK Settlement Agreement was executed in May 2011, Gil was COO of Cacique. (ECF No. 42: Gil Decl. ¶ 4.) He was also a 3.75 percent shareholder in Cacique.[4] (*Id.*) Gil is a signatory to the MTK Settlement Agreement, but the signature line states that he signed as President and CEO of MTK. (*Id.* Ex. 2) Cacique is not explicitly mentioned anywhere in the MTK Settlement Agreement. (*Id.*) However, as Reynaldo's points out, the MTK Settlement Agreement purports to bind not only the signatories but also a long list of entities and individuals including "affiliated entities." (*Id.* at §§ 7.1–7.2.) Reynaldo's argues that it was the intent of the parties to bind Cacique to the MTK Settlement Agreement as an affiliated entity. The MTK Settlement Agreement also contains broad releases of all claims "known or unknown" at the time the agreement was executed. (*Id.* at §§ 7.1–7.3.) Reynaldo's contends that these broad releases bar the present trademark and trade dress infringement claims brought by Cacique.

Cacique filed the Complaint in this action on February 12, 2013. (ECF No. 1.) Prior to filing suit, Cacique sent a cease-and-desist letter to Reynaldo's. (ECF No. 78: Tobin Decl. ¶ 11, Ex. 9.) In the letter and in the Complaint, Cacique alleges that the infringement by Reynaldo's began around April 2011, which is before the MTK Settlement Agreement was executed. (*Id.*; Compl. ¶ 13.) Reynaldo's filed its Answer along with the breach-of-contract counterclaim on April 13, 2013. (ECF No. 19.)

---

[4] At the time the MTK Settlement Agreement was executed, Gil also owned 18 to 19 percent of Cacique, USA. (ECF No. 144: Tobin Decl. Ex. B) Cacique, USA is the distribution arm of Cacique and was a separate business entity in 2011 that later merged with Cacique. (*Id.*)

The present Cross-Motions for Summary Judgment were filed on December 2, 2013, and December 17, 2013.[5] (ECF Nos. 41, 75.) The same arguments and nearly identical evidence have been presented in support of and in opposition to both Motions. The Cross-Motions and supporting documents were sealed by the Court due to extensive references to confidential settlement agreements—including the MTK Settlement Agreement and the Employment Settlement. The settlement agreements involve individuals and entities that are not parties to this action. The Court also granted a request from Reynaldo's to conduct additional depositions and file supplemental briefing pursuant to Federal Rule of Civil Procedure 56(d).[6] (ECF No. 54.) A hearing on the Cross-Motions for Summary Judgment was held on January 27, 2014.

### III. LEGAL STANDARD

Summary judgment should be granted if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The moving party bears the initial burden of establishing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). Once the moving party has met its burden, the nonmoving party must go beyond the pleadings and identify specific facts through admissible evidence that show a genuine issue for trial. *Id.*; Fed. R. Civ. P. 56(c). Conclusory or speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact. *Thornhill's Publ'g Co. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).

---

[5] Reynaldo's also filed a Motion for Summary Judgment on Cacique's trademark and trade dress claims. (ECF No. 64.) A separate order will issue on that motion.

[6] In the supplemental briefing, Reynaldo's references an apparent discovery dispute regarding the deposition of Jennie de Cardenas. (ECF No. 131.) Jennie was not one of the individuals that Reynaldo's named in its Rule 56(d) request. (ECF No. 47.) According to Reynaldo's, Jennie has not been made available for deposition despite repeated notices. Reynaldo's wants to depose Jennie about Cacique's corporate structure. But a declaration from Jennie has been filed on the docket in this case in relation to a protective order before the Magistrate Judge. (ECF No. 92.) The declaration states that Jennie has not been involved in Cacique business for ten years. Therefore, the Court finds that the inability to depose Jennie is not pertinent to determination of these Cross-Motions.

A genuine issue of material fact must be more than a scintilla of evidence or evidence that is merely colorable or not significantly probative. *Addisu v. Fred Meyer*, 198 F.3d 1130, 1134 (9th Cir. 2000). A disputed fact is "material" where the resolution of that fact might affect the outcome of the suit under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1968). An issue is "genuine" if the evidence is sufficient for a reasonable jury to return a verdict for the nonmoving party. *Id.* Where the moving and nonmoving parties' versions of events differ, courts are required to view the facts and draw reasonable inferences in the light most favorable to the nonmoving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007).

## IV. DISCUSSION

These Cross-Motions for Summary Judgment on the Reynaldo's Counterclaim hinge entirely on contract interpretation, making the counterclaim ripe for summary judgment. The Cross-Motions essentially present two issues: (1) whether Cacique is an "affiliated entity" bound by the MTK Settlement Agreement, and (2) if Cacique is bound, whether the MTK Settlement Agreement bars Cacique from bringing its trademark and trade dress claims. The Court resolves both issues in Cacique's favor.

**A.   Governing Principles of Contract Interpretation**

Before reaching the issues at the heart of these Cross-Motions, the Court must first address the governing principles of contract interpretation. "A settlement agreement is treated as any other contract for purposes of interpretation." *United Commercial Ins. Serv., Inc. v. Paymaster Corp.*, 962 F.2d 853, 856 (9th Cir. 1992). Moreover, state law applies to interpretation of contracts generally. *Id.* Under California law, which governs the MTK Settlement Agreement, the intent of the parties determines the meaning of the contract. Cal. Civ. Code § 1636. But a court should interpret a contract solely by its language if the language is "clear and explicit," especially when the contract has been reduced to writing. §§ 1638–39.

The parol-evidence rule comes into play when a court is presented with extrinsic evidence. A court may not consider extrinsic evidence of any prior or

contemporaneous oral or written agreement to vary or contradict the clear and unambiguous terms of a written, integrated contract. *Wolf v. Walt Disney Pictures & Television*, 162 Cal. App. 4th 1107, 1126 (2008). However, extrinsic evidence is admissible to interpret an agreement when a material term is ambiguous. *Id.* Here, the MTK Settlement Agreement contains an integration clause. (ECF No. 42: Gil Decl. Ex. 2 at § 15.7.) But both Cacique and Reynaldo's have presented the Court with extrinsic evidence to support their respective interpretations of the MTK Settlement Agreement. The Court finds that to the extent the Court relies on extrinsic evidence to interpret terms of the contract, it does not violate the parol evidence rule.[7]

When the meaning of a contract term is disputed, a court engages in a series of inquiries. *See id.* at 1126–27. First, the court provisionally receives any proffered extrinsic evidence and must determine whether the terms of the contract are reasonably susceptible to the interpretation advanced by that evidence. *Id.*; *see also Miller v. Glenn Miller Prods., Inc.*, 454 F.3d 975, 989–90 (9th Cir. 2006) ("California law recognizes that words of a written instrument often lack a clear meaning apart from the context in which the words were written . . . .") If the language is reasonably susceptible to the proposed meaning, the court admits extrinsic evidence. *Wolf*, 162 Cal. App. 4th at 1126–27. If there is no material conflict between the extrinsic evidence adduced, the court interprets the contract solely as a matter of law. *Id.* But when "there is a conflict in the extrinsic evidence, the factual conflict is to be resolved by the jury." *Id.* With these principles of interpretation in mind, the Court evaluates the two terms of the MTK Settlement Agreement that are in dispute.

/ / /

/ / /

---

[7] The Court has reviewed the evidentiary objections lodged by the parties. To the extent that the Court relies upon evidence to which one or more parties have objected, the Court **OVERRULES** those objections. As already indicated, any extrinsic evidence upon which the Court relies to interpret the MTK Settlement Agreement does not run afoul of the parol-evidence rule. Furthermore, the evidence upon which the Court relies is also relevant, within the declarants' personal knowledge, and based on nonhearsay under the Federal Rules of Evidence.

## B. Cacique Is Not an Affiliated Entity

The first issue to address is whether Cacique is even subject to the releases contained in the MTK Settlement Agreement, as Cacique was not a party to the lawsuit and did not sign the settlement agreement. Reynaldo's argues that Cacique is an "affiliated entity" of MTK under section 7.1 of the MTK Settlement Agreement. Section 7.1 contains a general release of claims. On the other hand, Cacique contends that it is not an "affiliated entity" of MTK and is not subject to the general release. The relevant portion of section 7.1 reads as follows:

> Plaintiffs and each of them and their agents, officers, directors, shareholders, partners, members, representatives, employees, attorneys, insurers, accountants, predecessors, successors, parent companies, subsidiaries, **affiliated entities**, assigns and beneficiaries, expressly waive any claims against Defendants and each of them, and fully, finally and forever release Defendants . . . from any and all claims, demands, causes of action, actions, proceedings, assertions of liability, obligations, loss, of every kind and nature, **whether known or unknown**, suspected or unsuspected, fixed or contingent, mature or unmatured, that Plaintiffs now own or hold or at any time may have held or owned against the Plaintiffs Released Parties . . . .

(ECF No. 42: Gil Decl. Ex. 2) (emphasis added).

Looking at the four corners of the MTK Settlement Agreement, the Court cannot immediately ascertain the meaning of "affiliated entities." The agreement does not define the term and does not specifically name any affiliated entities.[8] Moreover, Cacique is not explicitly named in section 7.1 or any other section of the MTK

///

---

[8] Section 7.1 does identify Antonio de Cardenas and the de Cardenas Law Group as additional non-party releasers, but does not specify their relationship to the parties in the lawsuit—i.e., whether they are "affiliated entities" or one of the myriad other non-party releasers such as agents or attorneys. (ECF No. 42: Gil Decl. Ex. 2 at § 7.1.)

Settlement Agreement. Thus, the Court must look elsewhere to assess whether Cacique is an affiliated entity under the MTK Settlement Agreement.

The Court notes that the absence of Cacique's name in the MTK Settlement Agreement is probative of a lack of intent to make Cacique subject to its general releases. But Reynaldo's directs the Court to prior agreements involving Gil, MTK, the Huff Funds, and Reynaldo's to demonstrate that all involved were aware of the link between Gil, MTK, and Cacique. Cacique is a direct competitor of Reynaldo's in the Hispanic cheese market. (ECF No. 79: Bloom Decl. ¶ 4.) Reynaldo's argues that those prior agreements—the Operating Agreement, Contribution Agreement, and Employment Agreement—safeguarded all involved from the negative consequences of the Cacique connection. (Reynaldo's Opp'n 14:4–15:9.) For example, the Employment Agreement between Gil and Reynaldo's included a non-compete claus. (ECF No. 50: Bloom Decl. ¶¶ 7, 11, Ex. 3 at § 9.)

However, the Court finds that these prior agreements are not as persuasive as Reynaldo's makes them out to be. While all involved were aware of Gil's family connection to Cacique, the prior agreements never refer to Cacique as an affiliate of MTK. Moreover, the fact that steps were taken to keep Gil's connection to Cacique separate from the acquisition of Reynaldo's actually demonstrates that MTK and the Huff Funds[9] understood that Cacique was not affiliated with MTK.

In addition, as Cacique argues, when Reynaldo's intends to bind an affiliated entity, it specifically names that entity. (Cacique Mot. 13:8–15.) The June 2010 Employment Settlement contains the same "affiliated entities" language as the MTK Settlement Agreement, and specifically identifies an affiliated entity—Lisy Corp. (ECF No. 42: Gil Decl. Ex. 3, Recital B.) Reynaldo's was a party to that agreement, and the Court finds this evidence persuasive. But the inquiry does not end there, because the term "affiliated entities" in the MTK Settlement Agreement is not

---

[9] Since the falling out with MTK, the Huff Funds now wholly own Reynaldo's. (ECF No. 50: Bloom Decl. ¶ 4.)

superfluous. *See* Cal. Civ. Code § 1641 ("The whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping interpret the other."). The mere fact that affiliated entities are not specifically named in the MTK Settlement Agreement cannot alone establish that Cacique is not an affiliated entity.

More helpful to the inquiry is attempting to define the term "affiliated entities." There are a number of definitions of "affiliate," and all include some element of control. *See, e.g.*, Cal. Corp. Code § 150 ("A corporation is an 'affiliate' of, or a corporation is 'affiliated' with, another specified corporation if it directly, or indirectly through one or more intermediaries, controls, is controlled by or is under common control with the other specified corporation."); Black's Law Dictionary (9th ed. 2009) ("A corporation that is related to another corporation by shareholdings or other means of control."). The contracting parties' intent and prior dealings can supersede strict legal definitions such as these when it comes to contract interpretation. Cal. Civ. Code § 1644; *see also Marder v. Lopez*, 450 F.3d 445, 451 (9th Cir. 2006). But Cacique bolsters the control element in the above definitions by pointing to the Operating Agreement that was executed when MTK and the Huff Funds created HFH to purchase and run Reynaldo's. (ECF No. 50: Bloom Decl. Ex. 2.) The Operating Agreement includes a definition of "affiliate" that reads as follows:

> "<u>Affiliate</u>" shall mean any individual, partnership, corporation, trust or other entity or association, directly or indirectly, through one or more intermediaries, controlling, controlled by, or under common control with the Member, Manager or other party being referenced. The term "control," as used in the immediately preceding sentence, means, with respect to a corporation, the right to exercise, directly or indirectly, more than fifty percent (50%) of the voting rights attributable to the controlled corporation, and, with respect to any individual, partnership, limited liability company, trust, other entity or association, the possession,

directly or indirectly, of the management or policies of the controlled entity.

(*Id.* at § 1.2.) Based on the legal definitions of affiliate and the definition contained in the Operating Agreement, the Court finds that the term "affiliated entities" in the MTK Settlement Agreement requires that either MTK or Cacique exercise some level of control over the other.

There is very little evidence linking MTK and Cacique in any sort of business capacity. MTK and Cacique entered into an oral agreement between February 2009 and April 2009, so that an MTK consultant could temporarily work for Cacique pending a change in his immigration status. (ECF No. 42: Gil Decl. ¶ 9, Kmett Decl. ¶¶ 8–9, Iglesias Decl. ¶ 2.) But this hardly establishes that Cacique exercised control over MTK, or vice versa.[10] While Gil was certainly involved in both MTK and Cacique at a high level at the time the MTK Settlement Agreement was executed in May 2011, there is no evidence that he was unable to observe the legal distinction between the two corporations. While Reynaldo's argues that Gil was entirely in control of both entities, the Court is not convinced. Gil has never been a director of Cacique and he has never attended a board meeting. (ECF No. 42: Gil Decl. ¶ 4.) Gil did own 3.75 percent of Cacique at the time the MTK Settlement Agreement was executed, but that was not a controlling share of the corporation. (*Id.*) Reynaldo's has proffered no evidence to put these facts in dispute.[11] Moreover, Gil signed the MTK

---

[10] The evidence Reynaldo's cites to support "close contact" between MTK and Cacique is objectionable at best. The evidence is merely a conclusory statement from Donna Tobin, trial counsel for Reynaldo's, citing a single exhibit that purports to demonstrate that "Cacique regularly issued checks to MTK at the direction of Gil in his capacity as employee and COO of Cacique." (ECF No. 51: Tobin Decl. ¶ 6, Ex. 3.) The exhibit actually two copies of the same check dated February 23, 2009 for $15,000. (*Id.* at Ex. 3.) The only purpose this invoice serves is to corroborate Cacique's proffered evidence of the February 2009 to April 2009 oral consulting agreement.

[11] Reynaldo's did file a supplemental declaration that includes deposition testimony from Gil and another Cacique employee, arguing that the testimony demonstrates Gil's control over MTK and Cacique. (ECF Nos. 142–144.) But this testimony only further proves that Gil is COO of Cacique and that employees report to him. It sheds no light on the relationship between MTK and Cacique during the relevant time period: May 2011. Nor does the supplemental declaration suggest Gil was unable to properly observe corporate formalities as the head of MTK and COO of Cacique.

1  Settlement Agreement explicitly as President and CEO of MTK only.  (*Id.* at Ex. 2.)
2  He did not sign the agreement as an individual, so whether Gil as an individual is
3  affiliated with Cacique is irrelevant.  In addition, MTK has apparently done no
4  business since April 2009 except to wind up its affairs.  (ECF No. 42: Gil Decl. ¶ 5,
5  Kmett Decl. ¶ 5.)  Thus, a relationship between MTK and Cacique that rises to the
6  level of "affiliate" at the time that the MTK Settlement Agreement was executed in
7  May 2011 is even less likely.

Based on the above facts and an absence of facts to the contrary, the Court finds that the contracting parties to the MTK Settlement Agreement did not intend Cacique to be subject to its terms as an affiliated entity.[12]

### C.    MTK Settlement Agreement Does Not Bar Cacique's Claims

Reynaldo's argues that the MTK Settlement Agreement's broad releases bar Cacique's claims here because Cacique admits in both its cease-and-desist letter and the Complaint that the alleged infringement began in April 2011, one month before the MTK Settlement Agreement was executed.  (ECF No. 78: Tobin Decl. ¶ 11, Ex. 9; Compl. ¶ 13.)  In contrast, Cacique contends that, if bound, the subject of the MTK Settlement Agreement is so unrelated to the intellectual-property claims here that the agreement cannot operate as a release.  (Cacique Mot. 18:4–20:6.)  Even if Cacique were an affiliated entity of MTK at the time the MTK Settlement Agreement was executed, the Court finds that the agreement does not release Cacique's trademark and trade dress claims.

There is no question that the MTK Settlement Agreement contains broad releases of all claims "known or unknown" at the time the agreement was executed.

---

[12] Reynaldo's also contends that Cacique admits to being subject to the MTK Settlement Agreement because Cacique seeks attorneys' fees in the Proposed Judgment submitted with these Cross-Motions. (Reynaldo's Opp'n 10:9–12.) But the law is clear on this point. A contractual attorneys' fees provision is reciprocal if a non-signor is sued as if it was a signor or party to the contract. Cal. Civ. Code § 1717; *Reynolds Metals Co. v. Alperson*, 25 Cal. 3d 124, 128–29 (1979). Therefore, Cacique's request for attorneys' fees does not amount to an admission that it is subject to the MTK Settlement Agreement.

(ECF No. 42: Gil Decl. Ex. 2 at §§ 7.1–7.3.)  The parties also expressly waive California Civil Code section 1542 regarding unknown claims at the time of settlement.  (*Id.* § 7.3.)  But the Court finds that, while the MTK Settlement Agreement contains broad releases, the agreement does create some boundaries. Recital C of the MTK Settlement Agreement is instructive:

> The Parties now desire to settle all past and present claims, differences, disputes, rights, interests, and liabilities which exist or may exist between them and **arising out of or which are in any way connected to the Complaint** and the underlying, facts, circumstances, and claims asserted therein without admitting any wrongdoing.

(ECF No. 42: Gil Decl. Ex. 2) (emphasis added).

The MTK Settlement Agreement arose out of a state court lawsuit concerning bonds held by certain investment funds—the funds used to acquire Reynaldo's.  The lawsuit had nothing to do with trademark or trade dress infringement, or intellectual property rights in general.  In interpreting the terms of the MTK Settlement Agreement, the Court cannot read each section in a vacuum.  Cal. Civil Code § 1641. Taken as a whole, the Court finds that Recital C reflects the parties' intent to resolve all claims "known or unknown" that relate to the investment and finance disputes that were the subject of the litigation leading up to the MTK Settlement Agreement.  An alternative interpretation would simply be untenable in light of the agreement's own terms.

Reynaldo's cites a handful of cases to support its proposition that the broad releases contained in the MTK Settlement Agreement encompass Cacique's intellectual-property claims.  But the Court finds those cases distinguishable from the one at bar.  In *Augustine Medical, Inc. v. Progressive Dynamics, Inc.*, 194 F.3d 1367, 1372 (Fed. Cir. 1999), the Federal Circuit, applying Minnesota contract law, held that a broad release in a settlement agreement stemming from a patent dispute barred a later patent claim.  But unlike here, the claims settled in the agreement and the

subsequent claims involved the same subject matter—patents. 194 F.3d at 1372. The reliance by Reynaldo's on this Court's conclusions of fact and law in *ProMex, LLC v. Hernandez*, 781 F. Supp. 2d 1013 (C.D. Cal. 2011), is similarly flawed. Once again, the settlement agreement at issue there and the subsequent claims that the agreement released both involved intellectual property rights. 781 F. Supp. 2d at 1016–17.

Instead, the Court finds that the holding in *World Trading 23, Inc. v. EDO Trading, Inc.*, No. 12-cv-10886-ODW (PJWx), 2013 WL 1767954 (C.D. Cal. Apr. 24, 2013), is more instructive. In *World Trading 23*, this Court held that the language of the prior settlement agreement required a nexus between the subject of the settlement agreement and the new claims. 2013 WL 1767954, at *3. The Court then went on to find that no nexus existed and the new claims were not barred, even though all of the settled claims and new claims both concerned intellectual property. *Id.* In this case, the Court finds that Recital C creates a similar nexus requirement. Moreover, the MTK Settlement Agreement is the product of a lawsuit involving investments and finance, while Cacique's claims are for trademark and trade dress infringement. The Court cannot comprehend any nexus between the subject of the MTK Settlement Agreement and Cacique's intellectual property rights. Cacique's claims are not even in the same sphere of influence as the MTK Settlement Agreement.

The Court holds that, even if Cacique were bound by the terms of the MTK Settlement Agreement as an affiliated entity, the agreement does not release Cacique's trademark and trade dress claims.

/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /

## V.   CONCLUSION

For the reasons discussed above, the Court **GRANTS** Cacique's Motion for Summary Judgment on Counterclaim.  (ECF No. 41.)   The Court **DENIES** the Reynaldo's Motion for Summary Judgment on Counterclaim.  (ECF No. 75.)

**IT IS SO ORDERED.**


February 7, 2014

_____
**OTIS D. WRIGHT, II
UNITED STATES DISTRICT JUDGE**